Mr. Bond, whenever you're ready. Thank you, Your Honor. Jeffrey Bond, counsel for Appellant's Powercomm Construction, and David Kwasnik. I have my law partner, Robert Batty, with me. Excuse me. Your Honors, on remand, this Court sent down two issues that were brought up initially. The first one in this attorney fee case was to do a reconsideration of the most critical factor under Hensley v. Eckerhart, and that is comparing the amount sought versus what is recovered, and also reconsidering the issue concerning unsuccessful plaintiffs. The underlying action was a collective action. There were 65 plaintiffs. Ten of them were dismissed on summary judgment. When the lower court received this Court's order, it issued its own letter order, and in writing advised Plaintiffs' Counsel not to re-raise any arguments that had already been raised. I'm sorry. I just want to clarify. So there were 65 plaintiffs to start, and 10 were dismissed on summary judgment, so that left 55 for the $100,000 settlement? That's correct. Okay. And with respect to the District Court's letter order in writing, it advised Plaintiffs' Counsel not to re-raise any arguments that had been brought before this Court previously, and it also specifically instructed Plaintiffs' Counsel to submit documentation that related to the issue of being able to segregate successful plaintiffs versus unsuccessful plaintiffs. And in response, Plaintiffs' Counsel submitted a document styled as a documentary submission, quote-unquote. And the documentary submission was an attachment of the fairness hearing that the parties had before the lower court to try to convince the court that it was a fair settlement and the court should approve it, which must be done in FLSA actions. The transcript that was provided was the identical transcript that had been provided to this court in the initial appeal. Subsequently, there was a telephonic hearing. The defendants, excuse me, were given the opportunity to file a written response, and we advised in writing and it's in the record that the majority of the arguments that were raised on remand were identical to what was raised before this court. And in fact, the written submission that the opposing party provided to the lower court was copied verbatim from the appeal brief that had been initially filed in this court. So as the lower court eventually ruled, as to the first issue, the most critical factor in evaluating attorney's fees, the degree of success, the court, again, did not reduce the fees at all. And instead of really evaluating the comparison that must be made, it came up with its own reasoning that we've not seen anywhere else. And that's the argument that if, first, it didn't want to disincentivize plaintiff's counsel from reaching a settlement. But more importantly... This is the step three analysis you're talking about now? Yes, sir, that's correct. More importantly, if there's a settlement that, in the mind of plaintiff's counsel, is reasonable based on a defendant's ability to pay, then that, in and of itself, reflects a successful litigation and merits 100% recovery as to the fees being sought. Now, in this instance, the plaintiffs initially demanded $1.745 million. This court, in its opinion remanding, recognized that they amended their demand down to $790,000 and advised the lower court that, when making the consideration again, that there was a 13% success ratio between the amended claim and what was recovered. Now, when the lower court again said, no, we're not going to reduce anything, it said, for whatever reason, it misapprehended this court's clear opinion and said that the 13% success rate related to the initial damages sought. And that's factually incorrect. It's wrong as a matter of fact. But if it's $0.06 on the dollar or $0.13 on the dollar, the jurisprudence of this circuit, as well as a number of other decisions from the lower court, have found that's not a complete success. And we would respectfully submit that if plaintiff's counsel is 87% unsuccessful in relation to what they initially claimed for their clients, then that, in effect, would eviscerate Hensley and his progeny. As to the second issue, the unsuccessful plaintiffs. The court did make a modest, unlike step three on the step two analysis, the court did make a modest adjustment to the attorney's fees of roughly 2.5%. And the 10 plaintiffs of the 65, Your Honor, that were dismissed, their aggregate initial claims were approximately 318,000. So they represented 18% of the total damages. And they were 100% unsuccessful. That is correct. Yes, Your Honor. So given these circumstances, the lower court used a methodology that was flawed, and it was shown by the example it used to be flawed. And what it stated was, well, we segregated out the fees that we could specify as to the unsuccessful plaintiffs. And as to every other billing, they either related to successful plaintiffs specifically, or they were intertwined so that there would be no reduction. Now, I'd like to remind the court that when this court remanded, it expressly stated, quote, it's difficult to imagine, unquote, how the claims of successful plaintiffs can be intertwined with unsuccessful plaintiffs. And there was no explanation from the lower court on this except for an attempt to provide. I'm not quite sure I see how the 55 were even successful. Really? They got $1,700 each. They were successful, Your Honor, in the sense that there was a settlement. In the transcript hearing, you know, opposing counsel is coming to try to support the lower court's position there should be no reduction. And the lower court has characterized the result as successful and that there should be no reduction given the degree of success. But the transcript hearing involving the fairness of the settlement, all those plaintiffs that testified came up, and they were not very happy about it. One of them, there was an allegation of fraud against counsel. They thought they were going to get millions. That's correct, Your Honor. That's correct. And so as to the reconsideration of the unsuccessful plaintiffs, the judge said, take a look at the response to the motion for summary judgment. Because the defendant's motion for summary judgment related to 17 plaintiffs. And they only got 10 of them thrown out. So for that reason, we're not going to reduce anything related to the fact, related to responding to the pleading that resulted in the 10 plaintiffs being dismissed with prejudice. It's inherently faulty. Sir, are you doing Step 2 or Step 3 now? I'm on Step 2, the unsuccessful plaintiffs. And so, Your Honor, with respect to the methodology that is employed in evaluating a situation where you have a multi-party case like this one, courts can do a few things. And what we've seen them do is we've seen them do across-the-board percentage reduction. We've seen them do, like here, a discrete reduction for the identifiable billings plus an additional percentage reduction. What we've not seen and what has not been provided is any case where there's only been a reduction for the plaintiffs that were thrown out. It wasn't provided by the other side. We couldn't find it. There's a quote from Hensley that is repeated in the other side's brief by – and it essentially goes to the consideration that there is no precise formula. But if you look at the actual page of that opinion, the court is not discussing multi-party litigation. It's discussing a plaintiff, singular, and it's talking about when there's been some successful claims and some unsuccessful claims for the plaintiff. It's not talking about multiple plaintiffs where some get thrown out and some stay in. And the case law is replete that there cannot be an intertwining. We cite the Adorno case from New York where it's the same argument here. And the judge said it's impossible. You had two plaintiffs that were successful, five that were unsuccessful. Those claims of the unsuccessful plaintiffs do not intertwine with the other plaintiffs. Well, at the end of the day, what do you say is a fair and reasonable resolution of this? Do you have a number? Do you have a methodology? What do you say? You know, a lot of times we get these fee cases back up here a second time and we just go ahead and take care of them. Not necessarily we're going to do that, but that's not unusual. So what do you say? And we've asked for that, Your Honor, in our reply brief citing the recent decision in Gilbert LLP. All right, so tell us what it is. Your Honor, our position has been on the lack of success. There is a record in the lower court, other decisions from the lower court, as of 25%. We know that there are decisions from this court that are higher. The Stoll case is 45%. McAvee is two-thirds. We would respectfully submit at least 25% as to the lack of success to what was sought. And as to the unsuccessful plaintiffs, their aggregate claims were more than 15%. They were 18%, almost $318,000. We would just ask for what has been done before in the courts in this circuit, and that's a percentage reduction. 15% of the plaintiffs got thrown out. We'd ask for a 15% reduction. You've done the math on that. 40% reduction on the aggregate. Whatever the initial fee claim was submitted to the court, the total would be roughly 40%. And do I have a figure in front of me right now? I don't, but that's the relief that we're requesting. Okay. Thank you, sir. Mr. Woodfield. May it please the Court. This court remanded the case back to the district court on two discrete issues. And in general, the decision on whether and in what amount to award fees is one committed to the court's discretion, subject only to review for abuse of discretion. And under the standard reversal of those decisions on remand, it's appropriate only if the district court was clearly wrong or committed an error of law. Now, let me first address the issue of step two, the unsuccessful plaintiffs. Five of them were given to us by the defendant as people who were in the class and were supposed to be timely, and the defendant moved on all ten of them, saying they were untimely. Not on the merits, but saying they were untimely. These five people were given to us as timely. We filed their opt-in forms when they opt in. And then the defendant came back and said, these people are untimely. You are unsuccessful as a matter of law. Under that logic, they could give us a thousand names and say we were terribly unsuccessful. That is inequitable, and the law under Henley requires that. Wait. The court, are you talking about the ten that the court dismissed on summary judgment? Yes. Five of those ten were given to us by the defendant as represented to us as timely when we were asked, when we provided notice. What does that mean? Five out of the 65? Yes. What happens in an FLSA representation? Well, as the plaintiff, wouldn't you know up front whether they were timely or not? No, ma'am, because we don't know who's in the class in an FLSA. There's only 65 people in this class. It's not. No, ma'am. The putative class is over 100. Okay. All right. I see. And what happens is we represent a number of employees. We send notice out. Wait. There were more than 65? More than 55 shared in this $100,000 settlement? No. The 55 did. Okay. But what happens in a representative action is we don't know all the employees of the defendant. We file a motion for notice. The defendant is ordered, if the motion is granted, to give us a list of the people who worked in the time period. And the defendant gave us those names. Now, we had some people who opted in saying we worked in that time period, five of whom did not. We didn't know them. They came forward and said we did. At that point, I don't know whether they did or not. They said we did. But five of the people the defendants represented. When you responded to the motion for summary judgment, didn't you try to find out whether they were timely or not? When the summary judgment was filed and we got the time records for those people, we determined that they were not timely, and we noted that we had no evidence that they worked within that time window. So we did not hold them up as timely, but they were presented to us by the defendant in the initial production. We sent them the notices because the defendant only was supposed to give us people who worked within the time window. The standard with regard to the judge and below, when the judge looked at this, he excised out all the particular time entries associated with these ten individuals. Now, I think we shouldn't have been taxed for the people that the defendant gave us, but he excised out all ten time entries. The defendant says we should be what I think is essentially sanctioned for a percentage, despite excising out the time entries related to those individuals, saying that the... On this second go-round with the district court in reducing the attorney's fees, where is the reasoning of the district court for how much it reduced for unsuccessful plaintiffs? In its opinion on the last two pages, it stated that given the factors that it had available to it, it determined that the... And this is at JA... Let's see, 214 to 216. It noted that the defendants testified in the fairness hearing that they believed that if they were hit with a verdict, they would go bankrupt. Now, this again presents a conundrum to me, and it's resolved by McAfee v. Bosgar, 738F3-81, where this court said in 2013 that the court must ask, and this was cited in the remand decision to the trial court below, the court must ask whether the plaintiff believed that a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award. Now, in this situation, under the defendant's logic, when the defendant says, if you hit us with this and you get us a fee award, we're going to go bankrupt and everyone will get nothing. You will all become unsecured creditors. If I factor that in and take the most that the defendants can pay, they're saying, by definition, you're unsuccessful. Their definition of success is me driving them into bankruptcy and therefore getting nothing, and that creates a logical anomaly. The case is at the point where I can get the best recovery for everyone involved, and the issue that the court sent it back, and again, this is the issue. The court remanded specifically said that the district court on the 38 percent success figure was wrong. It said, reconsider it in light of the 13 percent figure calculated by this court. And so the district court went back and did that, and the court said that it considered that we had been adequately successful to justify the fees that it was awarding. And so the court, this court, in order to reverse that, would have to find. So the court on the second go-around didn't make any reduction for degree of success because the court found you successful? It found us as successful as we could have been in the circumstances, yes, Your Honor. And that's at the JA-214. No, I, yeah, I just looked at that. So the court didn't reduce for degree of success? No, ma'am. But the issue here, again, turns on, and again, what is success in a case like this? Is success securing the most amount possible for each plaintiff? And I would submit it is. If you've got a case where the defendant is going to go bankrupt if you get a larger judgment and, thus, your clients get nothing, that is the defense definition of success. What about the other things the district court said, which included that the court does not wish to disincentivize plaintiff's counsel from reaching reasonable settlements? And then it went on to say that plaintiffs had agreed at the hearing that they faced two significant challenges, a lack of proof regarding willfulness and a lack of documentation. That's because the defendants didn't keep time records, which the CFR and the code requires them to keep. Going forward, I had a number of people who thought they worked X number of hours. Right, but wouldn't those latter two factors impact the degree of success in terms of the plaintiff being unable to present their case in chief because they couldn't come up with the evidence? The best evidence would have been of their hours worked, the hours that they actually worked, the records which the defendant did not have. That impacted my ability to prove my case because in legitimately proving a case, I have to say to the jury, my clients worked these number of hours. We didn't have the defendant's records. When the defendant said they haven't cited them, I can cite the court and I can ask the court to cite the CFR that says the law requires that defendants keep these records. Right, but at a minimum, wouldn't you be under an ethical obligation before you file your complaint to have ascertained whether or not you had proof of willfulness? Your Honor, we believe that these people were misclassified, yes. We've got – in this situation, we've got summary judgment on misclassification. So I think that we had good faith basis of coming forward on this. These people, the court below found that as a matter of law, the defendant misclassified them. The issue of willfulness, just because I can't get summary judgment on it as a plaintiff on an affirmative basis doesn't mean that I'm lacking a good faith basis. But when you have individuals that you're paying for in excess of 40 hours per week on years on end, it is a fair reason without knowing because I'm never going to have the defendant's basis on why they did things at the outset. But it was clear that they knew that they were doing this at the outset. Now, I would submit where defendants said that they had no – or that they were aware of no decision that said you cannot either cut fees as a percentage or by making discrete cuts based on time, that is counter to the exact language of Hensley v. Eckerhart, where the court said there is no precise rule or formula for making these determinations. The district court may attempt to identify specific hours that should be eliminated or it may simply reduce the award to account for the limited success. The court necessarily has discretion in making this equitable judgment. That is controlling on this and it doesn't support the defendant's position and it's inconsistent with the defendant's position saying that you have to reduce both. Moreover, it supports the district court's position where the district court followed that formula and cut those specific plaintiffs' numbers and didn't reduce by a certain percentage. That's consistent with Hensley v. Eckerhart. And, therefore, the court did not abuse its discretion and did not – it was not clearly wrong or commit an error of law such as under Zerastrian v. Darby, Mayor of Washington, D.C., in this court's decision that is a basis for reversing it. So, really, the only question that I think is potentially viable by the defense is the degree of success issue. And we've got to remember that this court, this – roughly this panel, with the exception of Judge Shedd, sent it back saying, look at it in terms of the 13% versus the 38% and define what your reasons are. And this court said, we're not telling you to change it. And the court never said, go back and change these numbers. It said, explain them. Analyze them and explain them and let us know your answer. And the court below came back and said, here is my rationale. I cut the – for the 10 individuals who were unsuccessful, but I still find them successful at 13%. And it found them successful for the reasons including the fact that – regardless of the number of plaintiffs, because that was what the defendant could absorb. That was all it could pay up front. As a result of that, we're here today on the attorney's fees issue because we agreed to do a fee petition and then whatever the award was to be paid over two years' time because the defendant couldn't pay any more. So we could have had 1,000 people or five people, and the degree of success would have been measured by the defendant's ability to pay. And so for the defendant to come forward and say, because I was unliquid enough to pay a judgment, you were not successful, is logically an opposite and also does not create a basis for which this court should be saying to the district court, you erred as a matter of law by finding the amount of time that you're putting forward for the plaintiff's fees to be paid over a period of two years as being unreasonable, just simply in light of the result obtained. In this case, we had defendants who lost the records, found some of them, and then came forward and moved to strike the people who were untimely. But they lost on summary judgment on misclassification. So this case was going forward solely on the issue of damages. They lost, and let me remind this court something that it should not have to be aware of. Plaintiffs in employment cases don't typically win summary judgment. We won summary judgment on the issue of liability here. The question going out was damages. And so when we determined, based on the testimony of the owner of the company, of the counsel representing to the court, which is why the fairness hearing transcript was submitted, where counsel for the court said to the district court below, if a judgment is obtained, it's likely this company is going to go bankrupt. To say that we were not successful because we didn't drive them into bankruptcy and become unsecured creditors and get nothing is a logical fallacy. Now, at this point, the last thing that I would point out is in terms of if this court is plagued by the idea that hasn't been raised by the fact that the settlement was for $100,000 and that there was an award of attorney's fees in excess of $179,000, the Supreme Court said in City of Riverside v. Garcia, and this just struck me as something that you all might be interested in. It's a U.S. Supreme Court decision from either 71 or 73, and it's a Justice Berger opinion, where the court said a 7-to-1 ratio of fees to reward is not unreasonable depending on the success of the case. And that's Justice Berger in that City of Riverside v. Garcia. That's Supreme Court precedent. But here, the court, again, did not send back any particular instruction, and the defendant or the appellant in this matter seems to be under the impression that this panel sent back an instruction to cut the fees. And if everyone will look at the remand decision, that is not what was said. It was said, explain your rationale. The district court below took pains to explain its rationale, and it cut the award by about $7,000. I think it was $7,006 or $6,007 for the number of unsuccessful plaintiffs, but it didn't cut for the degree of success. So it did not violate the court's order, and so it's consistent with what this court ordered or the court's decision in Darnell v. Hart, where the court remanded back for reconsideration and explanation of the fees, and this is cited in our case. It's this court's decision in 1723-70, where the court sent back saying, tell us how you explained we're setting aside the fees. Tell us how you got there. The plaintiffs or the district court took it, came back with different numbers, and said this is how I got here, and this court said it is not error because the court, the district court below did exactly what we instructed it to do, calculated the numbers. Unless this court finds that the court below contravened the law, crossed the line, this court did exactly what it's supposed to do, and I will submit to you that I cannot figure out a way that the court below crossed the line and broke the law. The defendant doesn't like it, but dissatisfaction with that decision doesn't make a reversible error. If there are no further questions, I'll yield. Thank you very much. Mr. Bond, you've got some rebuttal time. We're not asserting that the lower court broke the law. We're asserting that... the district court did just what we told the district court to do in our remand order. What's your response to that? I understand that's their argument, and they cite the Darnell case, and the Darnell decision related to a quantum Merowit application, which has different factors. We cited the Gilbert LLP decision that was subsequent to, not to Darnell, but as to, it was 2017 that basically stated that quantum Merowit fee cases are distinguishable from the standards applied in fee-shifting cases. But in Darnell, there was a finding that the court went through each one of the factors. And in quantum Merowit, one of the factors that may be considered is degree of success. Here, as the most important factor, it is degree of success. It's not a permissive consideration. It's mandatory that it must be considered. So we would submit the lower court did not follow this court's direction when it vacated in entirety the lower court's ruling. As to lack of degree of success, it raised two points. It didn't want to disincentivize plaintiffs from settling cases. And if plaintiff's counsel can settle a case because he thinks the defendant might file for bankruptcy, it's a complete success. And I've heard a representation that we represented at the fairness hearing that our client would file bankruptcy. And I don't recall that, but the court has the record in front of it, and it can verify whether or not that assertion was ever made. I don't recall us ever making an assertion in open court that we'd be filing bankruptcy in this case. There certainly was never any documentary evidence provided by either the other side or by us suggesting that we were getting ready to file bankruptcy. And I'd like to come back to what opposing counsel said. What is success? Because that's why we're here. And success has been defined not by his interpretation in the lower courts that it's a good deal because one side might have to file bankruptcy. It's comparing what you sue for versus what you get. And Hensley is very clear that in considering fee awards, you have to contemplate the entire scope of the litigation. Now, in the initial opinion, this court seized upon the amended damage claim in the second amended Rule 26A1 disclosures, which came to about $790,000. But the record reflects that the plaintiffs initially sued for $1.745 million. Two other circuits have already expressly stated that the scope of the litigation, and this is coming from Spagan versus, I'm sorry, and Quesada versus Thomason, 850F2nd, 537 Ninth Circuit, 1988, that the scope of the litigation encompasses the initial amount sought. But in either case, here we're talking about a 5.7% recovery on the initial damages or 13% on the amended claim. And in response, Your Honor, to your question as to whether or not the court properly applied the considerations as to both issues, we say it didn't. As to one, it made up a new factor. It didn't consider degree of success. And as to the other one, it was an entirely new methodology that had never been seen before. And the one example it provided, responding to a motion for summary judgment when it decided none of those fees should be stricken, reflects the inherent faultiness of the methodology. Thank you. Thank you, counsel. On behalf of the panel, I'd like to express our appreciation to counsel for their arguments today. We're going to come down and greet counsel after the clerk adjourns court for the day. This honorable court stands adjourned until tomorrow morning. God save the United States and this honorable court.
judges: G. Steven Agee, Henry F. Floyd, Stephanie D. Thacker